AO 91 (Rev. 11/11) Criminal Complaint

AUSA Sunil R. Harjani (312) 353-9353

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**
FEB 09 2017
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

RANDALL RYE

CASE NUMBER:
**UNDER SEAL**

**17CR 79**

## CRIMINAL COMPLAINT  MAGISTRATE JUDGE MASON

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From on or about September 1, 2015 to on or about January 11, 2017, in the Northern District of Illinois, Eastern Division, and elsewhere, , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1343 | engaged in a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises and by concealment of material facts, and, for the purpose of executing such scheme, caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely an interstate wire transfer of $240,000 from defendant's company's Fifth Third bank account to Investor A's account on or about March 11, 2016 |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

_____
BRENT POTTER
Special Agent, Federal Bureau of Investigation (FBI)

Sworn to before me and signed in my presence.

Date: February 9, 2017

_____
Judge's signature

City and state: Chicago, Illinois

MICHAEL T. MASON, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT )
)
NORTHERN DISTRICT OF ILLINOIS )

## AFFIDAVIT

I, Brent E. Potter, first being duly sworn under oath, hereby depose and state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and I am assigned to its Chicago Division. I have been employed by the FBI as a Special Agent for over 20 years, during which time I have conducted many financial fraud investigations and served numerous search warrants in such cases. I am currently assigned to an FBI squad dedicated to the investigation of federal wire and mail fraud offenses, as well as related financial crimes.

2. This affidavit is submitted in support of the attached criminal complaint, as well as an application for the issuance of a search warrant. The information contained in this affidavit is based upon my personal knowledge, as well as information provided to me by other law enforcement officers. It is also based upon my review of subpoenaed records, records obtained without the use of a grand jury subpoena, and on information provided to me by non-law enforcement personnel. Because this affidavit is submitted for the limited purpose of establishing probable cause with regard to the attached criminal complaint and application for a search warrant, it does not set forth each and every fact that I have learned during this investigation.

3. This affidavit is made for the limited purpose of establishing probable cause to support: (A) a criminal complaint alleging that, from no later than September 1, 2015 and continuing through at least January 11, 2017, RANDALL RYE engaged in a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises and concealment of material facts, and, for the purpose of executing

1

such scheme, caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, in violation of Title 18, United States Code, Section 1343 (wire fraud); (B) an application for the issuance of a warrant to search RYE's residence at Suite 2108, 160 East Illinois Street, Chicago, Illinois (the "**Subject Premises A**"), as described further in Attachment A1, and (C) an application for the issuance of a warrant to search RYE's office at Suite 803, 33 N. Dearborn Street, Chicago, Illinois ("**Subject Premises B**"), as further described in Attachment A2, for evidence of violations of Title 18, United States Code, Section 1343.

4. As further stated below, there is probable cause to believe that RYE, who resides in Chicago, Illinois, engaged in a scheme to defraud his investment management clients for over one year by making false statements and representations about his investment of their funds. Specifically, there is probable cause to believe that RYE, who managed over $1 million in client funds, sent text messages and account statements to clients which falsely represented that their assets were entirely invested in "managed client accounts," when RYE had actually spent those client funds on his own personal expenses, and made Ponzi-type payments to investors using other investors' funds.

**FACTS ESTABLISHING PROBABLE CAUSE**

5. The FBI initiated an investigation of RYE on or about October 13, 2016 based on information that RYE had engaged in unusual spending patterns in his bank account and wire transfers in and out of his account. RYE was not registered in any capacity with the Financial Industry Regulatory Authority ("FINRA") or any state or federal securities regulator. As further explained below, I have interviewed several of RYE's investors, whose funds were deposited into various bank accounts under RYE's control. I have also obtained and reviewed the bank records of RYE and his company, Faster than Light Trading, LLC (FTL), at both Citibank and Fifth Third

Bank. According to the bank records, RYE opened three accounts in the name of his company – one at Citibank and two at Fifth Third Bank, as well as two accounts in his own name at Fifth Third Bank and three accounts at Citibank. RYE was the sole signer on all of these accounts.

6. During my review of bank records, I found that funds from investors were frequently wired to the subject bank accounts and the majority of the funds were used to: (1) make payments of purported investment returns to other investor victims; and (2) pay RYE's personal expenses. As further detailed below, I believe there is probable cause to believe that RYE has engaged, and is continuing to engage in a wire fraud scheme, in violation of Title 18, United States Code, Section 1343.

### Information Obtained from Investor A

7. I conducted an interview with Investor A, a resident of Spring, Texas, on or about January 26, 2017. Investor A told me that he had first learned about RYE in 2015 from another investor who appeared to be experiencing excellent investment returns. According to Investor A, RYE said that he was an experienced options and futures trader and was interested in offering individual investment accounts to new clients through his trading firm, FTL. Investor A made an investment of $50,000 by wire transfer on or about November 18, 2015 to RYE's personal checking account number ending in 2941, followed by a $200,000 by wire transfer to the same checking account on or about November 25, 2015, followed by a wire transfer of $300,000 on or about December 14, 2015 to the same Citibank account. According to Investor A, RYE told Investor A that he traded client funds through Advantage Futures, a Chicago-based clearing broker and, after Investor A's investment, he/she began to receive regular e-mailed account statements from RYE. I have obtained these account statements from Investor A. These account statements bore the name "Advantage Futures" and they showed a steady increase in the value of Investor A's

accounts. Investor A sent another $150,000 on or about May 26, 2016. In all, Investor A has wired approximately $700,000 to RYE from November 2015 through mid-2016.

8. My examination of RYE's personal Citibank account number ending in 2941 showed that, after RYE received Investor A's funds into his account, he made numerous payments for personal expenses and did not send any funds to Advantage Futures. For example, immediately prior to the receipt of Investor A's $300,000 on or about December 14, 2015, RYE's Citibank account held a balance of approximately $65,000. The next day, RYE wired $50,000 to his mother, followed by another $50,000 wire to his mother on or about December 22, 2015. In addition, RYE withdrew more than $100,000 in cash from the account during December 2015, spent more than $12,000 on air travel through Korean Air Lines and more than $10,000 at a resort in Bali, Indonesia by December 22, 2015, as well as over $20,000 at two different luxury watch shops at Caesar's casino in Las Vegas, Nevada on or about December 14, 2015.

9. According to Investor A, Investor A requested and received a partial redemption of his investment from RYE on or about March 11, 2016, in the amount of $240,000, wired by RYE through from FTL's Fifth Third Bank account ending in 7282. RYE used the Clearing House Interbank Payment System (CHIPS) for this wire transfer, which is a wire transfer processing company. My examination of FTL account number ending in 7282 at Fifth Third Bank, opened by RYE on or about December 29, 2015, determined that RYE funded the $240,000 payment to Investor A entirely through investments derived from approximately eight other FTL investors. Based upon my training and experience and information obtained from CHIPS, I know that a CHIPS wire transfer is an interstate wire transfer because CHIPS processing centers for wire transfers are located outside the State of Illinois.

10. According to Investor A, RYE verbally advised Investor A that his/her FTL

investments were worth over $3 million in approximately September 2016. However, Investor A has repeatedly asked RYE to return all of his/her funds, but RYE has not returned approximately $360,000 of Investor A's principal at this time.

### Information Obtained from Investor B

11. Among the investors whose funds were used by RYE to make the above-mentioned March 11, 2016 payment of $240,000 to Investor A was Investor B. I interviewed Investor B on or about January 20, 2017. According to Investor B, he/she became acquainted with RYE in approximately 2014. RYE told Investor B that he was a successful futures and options trader who had developed his own proprietary computer trading algorithms, at least one of which he sold to Goldman Sachs Group, Inc. while he was still in college. RYE told Investor B that he used one of his algorithms to trade his own funds and those of a select few clients in managed accounts through his own company, which he identified as FTL. RYE told Investor B that he invested clients' funds in a mix of futures and options contracts, among other instruments.

12. Bank records show that Investor B made a purported $50,000 investment in an FTL managed account by wiring the funds to RYE's personal Citibank checking account number ending in 2941 on or about September 2, 2015. According to Investor B, Investor B had a phone text message exchange with RYE shortly after making the wire transfer. Investor B saved the text messages which he/she exchanged with RYE and provided the FBI with copies of these messages, which I have reviewed. According to the text messages, Investor B texted RYE on or about September 2, 2015 and wrote "funds should be in your account." RYE responded by text on or about September 3, 2015, stating "it came through and was credited to Advantage this morning … I went ahead and linked the funds into the autotrading system so you're up and running."

13. Based upon my examination of the bank records, RYE did not make any transfer of

Investor B's funds to Advantage Futures, and there was no linkage of the funds with any automated trading system. In fact, prior to Investor B's wire to RYE's personal Citibank account, the account held less than $1,000. Within days of receiving Investor B's funds, RYE spent over $25,000 on luxury air travel and accommodations at a resort on the Caribbean island nation of St. Lucia. According to Investor B, RYE had told Investor B that he would be taking a trip to St. Lucia, but he said nothing to Investor B about using his/her investment money to pay for the trip. According to their text message exchange on or about September 3, 2015, Investor B wrote "you two have a great time in St. Lucia!" and RYE responded "I surprised (RYE's girlfriend) and used my netjets card[,] shes in for a trip haha." The bank records demonstrate that RYE used Investor B's money to pay for a private plane trip to St. Lucia.

14. According to Investor B and bank records, Investor B wired another $155,000 into FTL's Fifth Third account number ending in 7282 between approximately January 25, 2016 and March 7, 2016. RYE used these funds, along with those of several other FTL investors, to pay $240,000 to Investor A on or about March 11, 2016, as well as to make a $110,000 payment on or about February 10, 2016 to Company A, a Chicago-based sports marketing firm, for tickets to expensive concerts and sporting events. RYE again texted a false statement to Investor B on or about January 25, 2016, shortly after receiving a $50,000 wire from him/her. RYE told Investor B, "Treasury received funds around 1 and credited to account so I will be able to integrate it tonight." Bank records show that RYE did not credit Investor B's funds to any trading account. In reality, RYE used the funds, in addition to those of other investors, to pay personal expenses, make a $50,000 wire transfer payment to his mother, and to pay $240,000 to Investor A.

### Information Obtained from Investor C

15. According to bank records, RYE also used Investor C's funds to pay $240,000 to

Investor A on or about March 3, 2016. I interviewed Investor C on or about January 30, 2017. Investor C, a resident of Carlsbad, California, was introduced to RYE through Investor B. Investor C told me that he/she was influenced by the excellent investment returns that Investor B appeared to be receiving and subsequently made the decision to invest with RYE. According to Investor C, RYE told Investor C that he would deposit Investor C's funds into Advantage Futures and trade the funds using his proprietary computer algorithm in a mix of instruments, including futures and options contracts.

16. According to Investor C and bank records, Investor C wired $80,000 for an initial investment to FTL's Fifth Third Bank account number ending in 7282 on or about February 2, 2016 and another $100,000 to the same account on or about March 30, 2016. Investor C received a number of FTL statements by e-mail from RYE shortly after investing, and my review of the statements show considerable appreciation in value. Investor C's last FTL statement was dated September 30, 2016 and gave his/her FTL account value as approximately $617,598. According to Investor C, Investor C has not received any of his/her funds back from RYE, despite numerous requests to RYE for the return of all of his/her investment principal, and RYE ceased all communication with Investor C as of approximately December 2016.

17. Based upon my review of the FTL Fifth Third Bank account number ending in 7282, RYE used Investor C's initial $80,000 investment, along with those of Investor B and several other FTL investors to: (1) make a wire transfer payment of approximately $50,000 to his mother on or about February 17, 2016, (2) pay Company A $110,000 for the purchase of sporting event and concert tickets, and (3) pay Investor A $240,000 on or about March 11, 2016. According to my review of the same account records, RYE used Investor B's subsequent $100,000 investment, in part, to make another purchase of approximately $38,000 from Company A for

concert and sporting event tickets, and pay $75,000 to what appears to be another FTL investor. None of Investor C's funds were transferred to Advantage Futures or used for trading purposes.

### Information Obtained from Investor D

18. I conducted an interview with Investor D, a resident of Encinitas, California, on or about January 20, 2017. Investor D was introduced to RYE through Investor B, who told Investor D about the investment returns that he/she was then experiencing from RYE and FTL. According to Investor D and bank records, Investor D made an initial investment of $150,000 by wire transfer to FTL's Fifth Third Bank account number ending in 7282 on or about June 2, 2016, followed by another $70,000 wire to the same account on or about July 25, 2016.

19. Investor D initially received several FTL investment statements by e-mail from RYE which indicated that his investment was appreciating considerably in value. For example, one such statement dated July 18, 2016 that I reviewed showed that Investor D's "closing balance" for that day was over $198,000.

20. Prior to Investor D's investment of $150,000, the FTL Fifth Third Bank account records shows a balance of approximately $78,000. My examination of the account records showed that RYE used some of Investor D's initial $150,000 investment to make a $125,000 payment to Investor B just one day later. RYE could not have made this payment to Investor B without the use of Investor D's money. RYE also did not invest Investor D's money into any securities, commodity futures or options contracts, despite sending FTL statements to Investor D which indicated otherwise.

21. According to Investor D, when he began to ask RYE to cash out some of his FTL investment in approximately September 2016 in order to pay for a real estate purchase, RYE stalled, made excuses or simply ignored Investor D's repeated requests for money. Finally, in or

about January 2017, RYE e-mailed Investor D what purported to be a "screen shot" of a Citibank wire transfer request made by RYE on his personal Citibank checking account number ending in 2941, dated January 10, 2017. Investor D provided the FBI with a copy of the screen shot, which I have reviewed. The screen shot e-mailed by RYE to Investor D showed that RYE's Citibank account balance was in excess of $38 million and showed that RYE had requested a $230,000 wire transfer payment to Investor D as of January 10, 2017. Despite RYE's e-mail, according to Investor D, no funds were subsequently received by Investor D.

22. My examination of the records of RYE's personal Citibank account number ending in 2941 shows that his actual account balance was far less than the claimed $38 million. RYE's January 10, 2017 balance never exceeded $2,000 and on January 11, 2017 never exceeded $6,000.

23. RYE followed up this screen shot e-mail with another e-mail to Investor D on or about January 14, 2017, in which he explained why his wire transfer to Investor D was purportedly cancelled. He stated "You are completely correct the wire to you I sent 2 screenshots of from earlier this week I was finally able to confirm over four hours spent at Citi business yesterday was in fact cancelled … I just wanted to make abundantly clear was not in any capacity manually cancelled from my end or under my request." RYE went on in his e-mail to explain that he would be sending a cashier's check to Investor D for the funds. No such cashier's check has yet been received by Investor D.

### Information Obtained from Investor E

24. Investor E's funds were among those used by RYE to make the March 11, 2016 payment of $240,000 to Investor A. I interviewed Investor E on or about January 24, 2017. Investor E told me that he met RYE in 2015 through Investor B, who told Investor E that he/she had been seeing high returns on his/her investment with RYE and FTL. According to Investor E,

RYE told him that he used a proprietary computer algorithm to trade client funds in a variety of investment instruments, including foreign exchange, commodity futures and options contracts. RYE told Investor E that he had a team of traders and support personnel working with him. Investor E subsequently opened several managed client accounts at FTL by submitting account applications to RYE. According to bank records and Investor E, Investor E made an initial investment of $50,000 by wire transfer to FTL on or about February 10, 2016, followed by another $50,000 wire on or about June 9, 2016, a $50,000 wire on or about July 7, 2016 and a final $50,000 wire on or about July 8, 2016. All of these wires were sent to FTL's Fifth Third Bank account number ending in 7282.

25. After making the investments, Investor E received regular e-mail account statements from RYE, which I have reviewed. The account statements purported to be issued from Advantage Futures, and showed considerable appreciation in value. RYE further told Investor E that Advantage Futures was the brokerage firm that had custody of his/her funds.

26. Based upon my examination of the bank account records, RYE used Investor E's funds, along with other investor funds, to make payments to other FTL investors, including Investor A, and pay his own personal expenses.

27. By late 2016, RYE did not respond to repeated requests by Investor E to return his/her funds. Investor E subsequently flew from California to Chicago in January 2017 and met with RYE in person to obtain his/her funds. RYE provided Investor E with three printed copies of what purported to be screen shots of Citibank wire transfer requests from RYE's personal checking account number ending in 2941 in the aggregate amount of $200,000. The documents were all dated January 11, 2017. According to Investor E, RYE assured him that he had already ordered the wire transfer and Investor E should receive his/her funds within a day or so. Investor

E returned to California shortly thereafter, reassured by RYE's printed wire transfer requests, but he/she did not receive any subsequent funds or wire transfer from RYE. RYE subsequently told Investor E that the wire transfers were cancelled by Citibank, which suspected fraud in the wire transfer requests. RYE told Investor E that, in addition to $38 million in his personal Citibank account, he had $21 million in a Morgan Stanley account. RYE promised to wire Investor E's principal and gains soon and that he/she would be "really happy" with the investment gains. According to Investor E, RYE has not sent any of the promised funds to Investor E.

28. Investor E provided the FBI with copies of the three wire transfer requests given to him/her by RYE, which I have examined. The three documents purported to show that RYE had a balance of at least $37 million in his Citibank personal checking account number ending in 2941. RYE's claim was false. RYE's actual account balance was far less than the claimed $37 million. RYE's January 10, 2017 balance never exceeded $2,000 and on January 11, 2011 never exceeded $6,000.

### Information Obtained from Fifth Third Bank

29. According to Individual A, a Fifth Third Bank employee, the bank became concerned about the pattern of RYE's banking deposits and withdrawals, and a bank representative contacted RYE to inquire about the nature of FTL's business in 2016. RYE told the bank representative that he was engaged in the investment business, and provided a bank statement, purportedly from his Citibank business checking account number ending in 4511, dated June 30, 2016 and showing a beginning balance of over $12 million and an ending balance for the month of over $11 million. Individual A provided the FBI with a copy of this bank statement, which I have examined. This purported account statement appears to be a fake. I have examined the actual June 30, 2016 bank statement from that Citibank account, which RYE opened on or

about December 28, 2015. The actual bank statement shows an account beginning balance for June 2016 of $155 and an ending balance of $140.

### Request for Issuance of a Complaint and Arrest Warrant

30. Based upon the foregoing information, there is probable cause to believe that, beginning no later September 1, 2015 and continuing through at least January 11, 2017, RYE devised, intended to devise and participated in a scheme to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations and promises, and by concealment of material facts, and for the purpose of executing that scheme, and attempting to do so, caused to be transmitted by means of wire communication in interstate commerce, certain signs, sounds and signals. In particular, for the purpose of executing the aforesaid scheme, and attempting to do so, RYE knowingly caused to be transmitted by means of a wire communication in interstate commerce a CHIPS wire transfer from Fifth Third Bank to Wells Fargo Bank in the amount of $240,000 on or about March 11, 2016, which represented a payment back to Investor A using other investors' funds, in violation of Title 18, United States Code, Section 1343.

### Request for Issuance of Search Warrants

31. In addition to a request for an arrest warrant, I submit this affidavit showing probable cause to believe that evidence of the wire fraud offense will be located at the **Subject Premises A** (RYE's residence) and **Subject Premises B** (RYE's Business), where he conducted the business of FTL.

32. RYE provided **Subject Premises A** address to Citibank as the business address for FTL on a "Business Deposit Account Application" filed by RYE on or about December 28, 2015 to open RYE's business checking accounts. RYE also provided **Subject Premises A** address to Citibank on or about August 1, 2014 as his home address for the purpose of opening Citibank

personal checking account number ending in 2941. RYE deposited a substantial portion of the investment funds that he received from Investors A through D into this Citibank account. Additionally, RYE opened Citibank business checking account number ending in 4511 in the name of FTL on or about December 28, 2015 and provided the bank with the address of **Subject Premises A** for its business address. The **Subject Premises A** address is also listed on the fake bank statement sent by RYE to Fifth Third Bank, as described above in paragraph 30.

33. RYE opened Fifth Third Bank business checking account number ending in 7282 in the name of FTL on or about December 29, 2015 and provided **Subject Premises A** as the business address of FTL. RYE deposited a large amount of the investment funds received from Investors A through D into this Fifth Third Bank account. Additionally, RYE opened two additional Fifth Third business checking accounts in the name of FTL on or about February 26, 2016 and provided **Subject Premises A** as the company's business address.

34. RYE incorporated FTL in the State of Illinois on or about December 15, 2015, and provided the address of its principal place of business as **Subject Premises A.**

35. According to Investor B, RYE's girlfriend told him/her in 2016 that RYE had a computer workstation in **Subject Premises A** that he used to trade and conduct business on behalf of FTL. Investor B also told me that he has visited RYE at **Subject Premises A** in 2016.

36. On or about February 3, 2017, I interviewed the doorman at **Subject Premises A**, who recognized RYE from a photograph I showed him, and who said that he knew RYE had been living at **Subject Premises A** for the last six months.

37. I interviewed Employee A on or about February 6, 2017. Rye hired Employee A, a resident of Chicago, Illinois, in approximately September 2016 to develop trading software for FTL, as well as to conduct business development for the company. According to Employee A,

13

RYE told Employee A that he generally worked and traded on his laptop at **Subject Premises A**. In addition, Employee A witnessed RYE trading on his laptop at the **Subject Premises A** on several occasions. In 2016, RYE told Employee A that he was building out a new office suite for FTL, located at **Subject Premises B**.

38. According to Employee A, RYE provided the key for **Subject Premises B** to Employee A, and Employee A performed work on behalf of FTL at this location on numerous days between in or about September 2016 and in or about January 2017. According to Employee A, **Subject Premises B** contained an office used by RYE, as well as a conference room and several computer workstations. RYE's office within **Subject Premises B** was equipped with a desktop computer, and Employee A saw RYE at **Subject Premises B** on approximately three occasions.

39. According to Investor B, RYE met him/her at **Subject Premises B** on one occasion in November 2016 in the late afternoon. Investor B's description of **Subject Premises B** was very similar to that provided by Employee A. RYE told Investor B that he could not meet with Investor B during the day, because there was trading going on at that location and Investor B might see proprietary data on a computer screen or desk. While at **Subject Premises B** with Investor B, RYE accessed and printed out several Internal Revenue Service Forms 1099 for Investor B and other FTL investors. The Form 1099s purported to list the FTL investors' gains in their accounts managed by RYE for 2016.

40. Based upon my training and experience in investigating fraud and serving search warrants, and the training and experience of law enforcement officers with whom I have spoken, I am aware that individuals who run investment businesses often keep records related to that business. This information can include information in both electronic and paper form related to names of clients, client account statements, bank statements, brokerage statements,

communications and correspondences with clients, and statements about total assets under management for each client. Similarly, based upon my training and experience, I am aware that individuals often store personal records in both electronic and paper form related to their personal finances in their offices and homes, which can include personal bank account statements, personal brokerage statements, personal mortgage statements, and records relating to assets and liabilities and personal income and expenditures of funds. Based on my training and experience, I am also aware that small or solo traders and advisers operating investment businesses often keep documents and records in both electronic and paper form relating to their investment businesses at the home and the office, as they tend to work at both locations interchangeably.

### Specifics Regarding Searches of Computer Systems

41. Based upon my training and experience, and the training and experience of specially trained computer personnel whom I have consulted, searches of evidence from computers commonly require agents to download or copy information from the computers and their components, or remove most or all computer items (computer hardware, computer software, and computer-related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

    a.    Computer storage devices can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to

accomplish this kind of data search on site.

b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

42. In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

43. In addition, a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

**Procedures to be Followed in Searching Computers**

44. The warrant sought by this Application does not authorize the "seizure" of

computers and related media within the meaning of Rule 41(c) of the Federal Rules of Criminal Procedure. Rather the warrant sought by this Application authorizes the removal of computers and related media so that they may be searched in a secure environment.

45. With respect to the search of any computers or electronic storage devices seized from the location identified in Attachments A1 and A2 hereto, the search procedure of electronic data contained in any such computer may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

    a. examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein;

    b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

    c. surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein;

    d. opening or reading portions of files in order to determine whether their contents fall within the items to be seized as set forth herein;

   e. scanning storage areas to discover data falling within the list of items to be seized as set forth herein, to possibly recover any such recently deleted data, and to search for and recover deliberately hidden files falling within the list of items to be seized; and/or

   f. performing key word searches through all storage media to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B.

46. Any computer systems and electronic storage devices removed from the premises during the search will be returned to the premises within a reasonable period of time not to exceed 30 days, or unless otherwise ordered by the Court.

## CONCLUSION

47. Based on the above information, I respectfully submit that there is probable cause to believe that wire fraud offenses, in violation of Title 18, United States Code, Section 1343, have been committed by RYE, and that evidence relating to this criminal conduct, as further described in Attachment B, will be found in the **Subject Premises A**, as further described in Attachment A1, and **Subject Premises B**, as further described in Attachment A2, and therefore respectfully request that this Court issue a criminal complaint for RYE and a search warrant for

**Subject Premises A and B** authorizing the seizure of the items described in Attachment B, pursuant to the protocol described in the addendum to Attachment B.

FURTHER AFFIANT SAYETH NOT.

_____
Brent E. Potter
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this 9th day of February 2017, at Chicago, Illinois.

_____
The Honorable Michael Mason
United States Magistrate Judge
Northern District of Illinois